E-FILED
Friday, 21 December, 2018  11:17:23 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## ROCK ISLAND DIVISION

| | | |
|---|---|---|
| CMB EXPORT, LLC, and CMB SUMMIT, LLC d/b/a CMB REGIONAL CENTERS, | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.:4:18-CV-04050-SLD-JEH |
| | ) | |
| ANGELIQUE BRUNNER and PETTLES GROUP, LLC d/b/a EB5 CAPITAL, | ) ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT AT LAW

Plaintiffs, CMB EXPORT, LLC, CMB SUMMIT, LLC d/b/a CMB REGIONAL CENTERS ("CMB" or the "Company"), by and through its attorneys, LEWIS BRISBOIS BISGAARD & SMITH LLP, for its Complaint against Defendants, ANGELIQUE BRUNNER and PETTLES GROUP, LLC d/b/a EB5 CAPITAL (collectively, "Defendants"), state as follows:

## THE PARTIES

1.      Plaintiff, CMB Export, LLC is a Texas limited liability company and Plaintiff, CMB Summit, LLC is a Texas limited liability company, each with its principal place of business located at 7819 42nd Street West, Rock Island, Illinois 61201.  CMB is engaged in providing a variety of resources under the federal EB-5 Visa Program by which foreign nationals invest in development projects, which benefit the United States economy as a means to qualify for permanent residency status in this country.  CMB's business is literally worldwide, with clientele from countries in Europe, Asia, and Latin America.  The acts of Defendants caused harm to CMB in Illinois and, as more fully set forth below, materials exchanged between the Defendants and non-parties were misappropriated from CMB's headquarters in Illinois.

2.      Defendant Angelique Brunner ("Brunner") is an individual who resides at 701 Lamont Street, NW, Washington, DC.  She is a former independent contractor of CMB having performed services for CMB related to CMB's projects through CMB's office in Rock Island, Illinois. At all times relevant hereto Brunner acted with and through Kimberly Atteberry ("Kim Atteberry"), a one time independent contractor and later employee of CMB, Christopher Atteberry ("Chris Atteberry") and Vermilion Consulting, LLC ("Vermilion") as a part of the civil conspiracy set forth hereinafter to misappropriate trade secrets and interfere with the prospective economic advantage of CMB.  Brunner is currently the President of Pettles Group, LLC d/b/a EB5 Capital which is a direct competitor of CMB in the EB-5 marketplace.

3.      Defendant Pettles Group, LLC d/b/a EB5 Capital (hereafter "EB5 Capital") is a Delaware limited liability company, operating in the EB-5 financial space, securing financing packages for EB-5 appropriate projects. It is a direct competitor with CMB. At all relevant times, EB5 Capital maintained its principal place of business in Washington, DC.

4.      On June 14, 2013, CMB filed a lawsuit against Kim Atteberry, Chris Atteberry and Vermilion styled *CMB Export LLC, et al v. Atteberry, et al*, Case No. 4:13-cv-04051-SLD-JEH ("CMB I"). CMB I asserted claims against the Atteberrys and Vermilion for violation of the Illinois Trade Secrets Act, Breach of Fiduciary Duty, Violation of the Computer Fraud and Abuse Act, Tortious Interference with a Prospective Business Advantage and Conspiracy. CMB I is now settled.

5.      In the course of discovery in CMB I, CMB learned that Defendants Brunner and EB5 Capital together with Kim Atteberry, Chris Atteberry and Vermilion engaged in previously unknown unlawful acts as more fully set forth herein in furtherance of a conspiracy to misappropriate, exploit and acquire by illicit means CMB's proprietary information.  The conspiracy pled herein arose after the Atteberrys' conduct complained of in CMB I and after EB5 Capital and Brunner agreed to a non-

disclosure agreement with Vermilion and after law enforcement had seized CMB materials in the hands of the Atteberrys and Vermilion, as described below.

6.     The civil conspiracy set forth below began while Kim Atteberry was a resident of the State of Illinois and many of the acts in furtherance of the conspiracy occurred in Illinois.  Kim Atteberry formerly served as an independent contractor of CMB; and subsequently was a direct employee and a vice-president of CMB.

7.     The civil conspiracy set forth below began while Chris Atteberry was a resident of the State of Illinois and many of the acts in furtherance of the conspiracy occurred in Illinois.  Chris Atteberry is Kim Atteberry's husband and a former hourly employee for Rock Island Auction Company ("Rock Island Auction"), an independent company owned and operated by the manager of CMB.  Rock Island Auction Company shares facilities with CMB.

8.     Vermilion currently is a limited liability company and it provides consulting services in connection with securing EB-5 financing for their projects. Vermilion was formed initially to provide EB-5 related services exclusively to CMB and to provide other non-EB-5 related consulting services through Chris Atteberry. It is the consulting company owned by its members, Kim and Chris Atteberry, before, during and after Kim Atteberry's employment with CMB and is the corporate entity that Kim Atteberry and Chris Atteberry utilized to further the civil conspiracy which is described herein.  The civil conspiracy set forth below began while the members of Vermilion were residents of the State of Illinois and its business office was located in 1620 21st Street, Rock Island, Illinois.  Acts in furtherance of the conspiracy took place while Vermilion's principal place of business was in Illinois.

## FACTUAL ALLEGATIONS

### CMB's Business

9.      The EB-5 Visa Program allows foreign investors to qualify for a permanent visa to reside in the United States by investing in U.S. businesses that create full time employment for U.S. workers.  CMB operates under approved "Regional Center" designations within the EB-5 Visa Program. Regional Center activities allow foreign investors to qualify for permanent residency by making investments as a limited partner in a limited partnership or a member in a limited liability company formed or sponsored by the Regional Center.  The limited partnership or limited liability company then generally invests into qualified enterprises that are intended to create at least ten U.S. jobs per investor as a result of the investments.

10.      CMB and its affiliates operate U.S. Government-authorized Regional Centers under this program and manages foreign investor money by vetting and structuring investments within various projects deemed suitable for investment under the EB-5 Visa Program that are intended to create the requisite number of jobs.  CMB Export, LLC has been operating an approved EB-5 Regional Center for more than twenty years.

11.      In the course of its business, CMB collects and maintains highly confidential personal information on potential investors, including highly sensitive financial data, highly confidential and privileged attorney-client information, highly confidential and proprietary investment project information, in addition to developing and maintaining its own proprietary business models for client contact, outreach, project evaluation, and project development.

12.      Over the course of more than 20 years in business, CMB developed or acquired large amounts of proprietary information, including, but not limited to, business methodologies, project and investor evaluation methods, computer software, business ideas, billing procedures, pricing data,

client personal and financial data, potential and ongoing investment project details, project financing, customer servicing methods, customer databases, legal source material, job reports and methodologies relating to the calculation of jobs for projects and other data related to its EB-5 business.  CMB's product services and business operations incorporate and are based on its confidential and proprietary information.

13.     CMB has expended a significant amount of time, effort and resources to protect its confidential and proprietary information.  By way of example, CMB stores its electronic data and confidential information behind password firewalls, restricts access to both its hard copy and electronic client information, and advises its employees and managers of the highly sensitive and confidential nature of the information that it maintains. CMB required all independent contractors to execute confidentiality agreements and required all employees to follow confidentiality procedures pursuant to its employment policies.

## Kim Atteberry's and Vermilion's Work for CMB

14.     On July 18, 2011, Kim Atteberry, through her consulting entity Vermilion, began working for CMB as an independent contractor. Kim Atteberry was retained to provide economic impact evaluation services and relevant economic program guidance for various CMB investment projects.

15.     As part of her retention as an independent contractor, Kim Atteberry executed an Independent Contractor Agreement with CMB. The Independent Contractor Agreement, *inter alia*, precluded Kim Atteberry from accepting other employment during its term. In addition, the Independent Contractor Agreement contained specific language regarding CMB's confidential, proprietary and trade secret information:

> The Contractor acknowledges that during the engagement she will have access to and become acquainted with various trade secrets, inventions, innovations, processes, information, records and specifications owned or licensed by the Company and /or

used by the Company in connection with the operation of its business, including, without limitation, the Company's business and product processes, methods, customer lists, accounts, and procedures. The Contractor agrees that she will not disclose any of the aforesaid, directly or indirectly, or use any of them in any manner, either during the term of this Agreement or at any time thereafter, except as required in the course of this engagement with the Company. All files, records, documents, blueprints, specifications, information, letters, notes, media lists, original artwork/creative, notebooks, and similar items relating to the business of the Company, whether prepared by the Contractor or otherwise coming into her possession, shall remain the exclusive property of the Company.

The Contractor shall not retain any copies of the foregoing without the Company's prior written permission. Upon the expiration or earlier termination of this Agreement, or whenever requested by the Company, the Contractor shall immediately deliver to the Company all such files, records, documents specifications, information, and other items in her possession or under her control.

16.     After commencing her work with CMB, it became immediately apparent to CMB that, while Kim Atteberry had a background in economic analysis and previously served as an economist for the USCIS, she lacked the training and experience specific to the EB-5 industry. Importantly, Kim Atteberry had no exposure to pertinent aspects of the EB-5 process and had never seen key documents necessary to submit and implement a successful EB-5 project.

17.     As such, CMB invested substantial resources in Kim Atteberry's development.  CMB personnel trained Kim Atteberry and taught her valuable tools and methodologies utilized by CMB, all of which CMB maintained as confidential and proprietary. CMB exposed Kim Atteberry for the first time to EB-5 documentation, including, *inter alia*, loan packages, I-526 templates and filings, I-829 templates and filings, offering materials and I-924 filings. CMB taught Kim Atteberry its strategies for vetting and selecting EB-5 related projects. CMB also introduced Kim Atteberry to numerous CMB contacts in the EB-5 industry, including developers and lenders, with whom Kim Atteberry held no previous relationship.

18.     Kim Atteberry also had access to CMB's list of foreign agents used by CMB to obtain investors and investor information. Kim Atteberry knew CMB held this information in the

strictest confidence because if this information fell into the hands of a competitor, a competitor could target such agents to circumvent CMB from reaching potential investors for EB-5 projects.

19.    In or about 2012, CMB began negotiating with Kim Atteberry to become an employee of CMB.

20.    In 2012, Kim Atteberry moved from Washington, D.C., with her husband Chris Atteberry, to Rock Island, Illinois to work at CMB's headquarters.

21.    After her move to Illinois, CMB continued to compensate Kim Atteberry pursuant to her Independent Contractor agreement until Kim Atteberry formally accepted a vice president position with CMB on or about November 14, 2012.

22.    As an employee holding a senior management position with CMB, CMB expected Kim Atteberry to work exclusively for CMB and utilize CMB's materials and resources solely for the benefit of CMB. This mirrors the contractual obligation of Kim Atteberry to work exclusively for CMB as an independent contractor.

23.    CMB directed Kim Atteberry to utilize the CMB email address assigned to her and perform her work from CMB's secure network.

24.    CMB's Employee Handbook contained a strict policy regarding use of CMB documents, including precluding employees from copying or maintaining company files and data. The Employee Handbook expressly advised employees that "Making copies or removing files from CMB is against company policy and will be treated as theft.  CMB will pursue criminal prosecution as well as civil prosecution in matters divulging company data or programs to an outside entity."

25.    As a vice-president, Kim Atteberry's responsibilities not only included performing economic valuations and assessments of various projects, but also serving as the project development team leader responsible for gathering the relevant documentation of new business

projects for CMB.  In this capacity, Kim Atteberry had relationships with CMB's outside business and immigration professionals as well as U.S. Government contacts.

26.     As a vice-president, Kim Atteberry had access to virtually all of CMB's proprietary information on projects, potential investors, and current and potential investment projects, all of which were protected by non-disclosure agreements.  She also had access to CMB's sales and development plans, marketing plans, legal documents, and financial performance evaluations.

27.     Kim Atteberry, as the project development team leader, had involvement with "near term" (estimated to be less than six months development time) business projects worth a minimum of $3.2 billion.  At the time she abruptly resigned, these same projects were worth $260 million in income to CMB.

### Chris Atteberry Aides Kim Atteberry in Stealing CMB's Valuable Confidential and Trade Secret Materials to Benefit Themselves and Their Company Vermilion

28.     During the time CMB and Kim Atteberry were negotiating her position to become an employee, which would require her to move to Rock Island, she asked CMB management to create a position for her husband, Chris Atteberry.  As an accommodation to Kim Atteberry, CMB owner Pat Hogan ("Hogan") offered Chris Atteberry a job solely within Hogan's auction business, Rock Island Auction, a high-end, antique firearm and other weapons auction house.  Chris Atteberry began working for Rock Island Auction on August 27, 2012.  His assigned duties were exclusive to Rock Island Auction.

29.     At no time was Chris Atteberry authorized to have access to or view or possess any CMB materials, including any proprietary information or any other documents in possession of or developed by the Company.  In fact, Mr. Hogan expressly advised Chris Atteberry that there was no job opportunity for him at CMB. As a Rock Island Auction employee, Chris Atteberry was restricted from accessing CMB information through the CMB security measures described below.  Moreover,

Kim Atteberry and Chris Atteberry represented to CMB that Chris Atteberry's role in Vermilion was restricted to his aviation industry work.

30.     Unbeknownst to CMB, Kim Atteberry granted Chris Atteberry access to CMB's confidential documents—despite Chris Atteberry having no affiliation with CMB or permission to view or access CMB information. By sharing CMB confidential and proprietary information with her husband, Kim Atteberry blatantly and knowingly ignored CMB's policy and procedure.

**Angelique Brunner and EB5 Capital's Relationship to CMB and Kim Atteberry**

31.     In or around 2011, Angelique "Angel" Brunner ("Brunner") approached CMB seeking employment. On November 16, 2011, CMB hired Brunner as an Independent Contractor and Brunner began training at CMB's Headquarters in Rock Island. Brunner executed an Independent Contractor Agreement. The language in Brunner's Independent Contractor Agreement relating to confidentiality is identical to the language in Kim Atteberry's Independent Contractor Agreement. CMB issued Brunner a CMB email address and she traveled with CMB's then senior vice-president for operations, Mr. Kraig A. Schwigen, for a project meeting. After approximately three weeks, CMB and Brunner could not reach compensation terms and the parties terminated the relationship.

32.     Upon termination of the relationship, Mr. Schwigen requested that Brunner return all CMB materials in her possession and Brunner complied by sending CMB a package of documents in her possession and also agreed to delete all electronic files.

33.     For security measures, when a relationship with an employee or independent contractor is terminated, CMB maintains the dissociated person's CMB email address and all emails to such address are subsequently forwarded to CMB's senior management personnel.

34.     Kim Atteberry and Brunner have known each other since prior to working for CMB. When Brunner became an independent contractor for CMB in November 2011, Kim Atteberry was already consulting for CMB.

35.     The week before Kim Atteberry's abrupt resignation, while attending the P3 Conference in Dallas, Texas as a CMB representative, Kim Atteberry and Brunner were meeting together with industry insiders.[1]

36.     After Brunner and CMB severed their relationship, Brunner would contact Mr. Schwigen asking basic advice on EB-5 deals she was handling through her Regional Center. It was clear to Mr. Schwigen that Brunner, as an individual, at that time, lacked the technical skills, background, and expertise to structure larger scale EB-5 projects and secure foreign investors. In fact, this was why Brunner originally requested to work for CMB.

**Kim Atteberry's Resignation from CMB and the Conspiracy to Damage CMB**

37.     On Tuesday, February 26, 2013, Kim Atteberry abruptly resigned from CMB, effective immediately.  She resigned by sending an email message to Mr. Hogan while he was out of town.

38.     Immediately upon receiving the notice, Mr. Hogan called Mr. Schwigen who was in CMB's office. Mr. Schwigen walked over to Kim Atteberry's office and found her—with her husband—collecting personal items. Mr. Schwigen, in both Kim Atteberry's and Chris Atteberry's presence, requested Kim Atteberry return all CMB information and documents in her possession. Kim Atteberry responded that she had no CMB materials or information and that she had deleted or destroyed everything in her possession—this statement was false. CMB subsequently learned that

---

[1]That same week, the Atteberrys received a "Save the Date" for Brunner's upcoming wedding.

this false representation was designed to prevent or delay CMB from uncovering the Atteberrys'
unlawful activities.

39.     On Thursday, February 28, 2013, CMB received an email from Kim Atteberry
directed to the CMB e-mail address formerly assigned to Brunner.  Atteberry intended to send the e-
mail to Brunner. However, it is believed the e-mail never reached Brunner because Kim Atteberry
used Brunner's old CMB e-mail address. The inquiry was prefatory seeking to gauge Brunner's
willingness to pursue redirecting EB-5 opportunities. The e-mail referenced a project in Tennessee
that "CMB worked for a time then pulled away from." Kim Atteberry stated to Brunner "I want to
make sure you are interested in pursuing the project, otherwise, I will want to direct them to another
RC [Regional Center]. Talk soon. Thanks".

40.     The receipt of the email prompted CMB to conduct a search of its computer server
and systems. In doing so, CMB uncovered Kim Atteberry had copied vast amounts of data by e-
mailing CMB confidential and proprietary materials to her and Chris Atteberry's Vermilion email
address and personal e-mail addresses.  No valid basis existed for Kim Atteberry to email such
information to other e-mail addresses she and Chris Atteberry maintained.  Indeed, Kim Atteberry
took such actions to circumvent CMB's security protocols.

41.     CMB reported the conduct to the Rock Island Police Department.  On March 4, 2013,
the Rock Island Police Department executed a search warrant on the Atteberrys' home. At the time
of the execution, the Rock Island Police found the Atteberrys copying CMB files.  The Rock Island
Police Department seized, *inter alia*, three computers, at least one flash drive, the Atteberrys'
cellular phones, and hard copy documents. The search revealed the Atteberrys' lies and their efforts
to obtain CMB's proprietary business secrets.  Kim Atteberry intentionally and knowingly lied to

Mr. Schwigen when she told him she had deleted and destroyed all of CMB's property in her possession.

42.     Moreover, the week before Kim Atteberry's abrupt resignation, while she was at the P3 Conference in Dallas with Mr. Schwigen, Chris Atteberry improperly gained access to CMB's network by fabricating a story that he needed a document to send to Kim Atteberry while she was out of the office. Under false pretense, CMB's IT employee granted Chris Atteberry's request.

43.     CMB's investigation and the search warrant revealed that prior to her resignation Kim Atteberry and Chris Atteberry had removed significant amounts of CMB's confidential proprietary and privileged information. Specifically, while still employed by CMB, Kim Atteberry removed vast amounts of CMB proprietary information, such as requests for evidence, business plans, regional center applications, CMB annual reports to the USCIS, highly confidential individual client documents (including personal financial information, family data, and immigration data), loan agreements, project pro formas, loan pro formas, intercreditor agreements, partnership documents, requests for qualifications by potential projects, as well as highly sensitive project information from private developers, state and federal entities, and general CMB investment information. Much of the information stolen by the Atteberrys was information that Kim Atteberry had never worked on, some of it dating back years before she ever performed services for CMB.

44.     The materials stolen by the Atteberrys were enough for them to set up a competing operation, or, in the very least, utilize it for their financial gain. Although the Rock Island Police Department seized computers, at least one flash drive, cellular phones and paper documents, the

Atteberrys and Vermilion were still able to access their email accounts through the web and any CMB documents that had been electronically sent to their email accounts.[2]

45.    Based on communications prior to Atteberrys' abrupt departure, it was evident that Kim and Chris Atteberry concocted a scheme to pilfer CMB's most valuable assets and engage in competing activities in the marketplace with the information unlawfully obtained. This scheme is the subject of the conspiracy pled in CMB I.

46.    Chris Atteberry had no EB-5 skills or experience. However, once his wife abruptly resigned from CMB, he began working full time for Vermilion performing EB-5 related work.

47.    One of Kim Atteberry's first contacts after she resigned from CMB, if not her first point of contact, was Brunner, who, at the time, had a struggling EB-5 business, operating under the name EB5 Capital. After Kim Atteberry's abrupt resignation, she seamlessly began working with Brunner on EB-5 projects. Kim Atteberry sent multiple invoices to Brunner for such work in the first three months after her resignation.

48.    On March 4, 2013, just before the Rock Island Police executed the search warrant on the Atteberrys' home, Kim Atteberry, Brunner and EB5 Capital executed a written non-disclosure agreement ("NDA"). The NDA was executed first by Brunner, as the authorized representative of EB5 Capital, then sent via email to Kim Atteberry, who was located in Rock Island, Illinois and who thereafter signed the NDA. The NDA has been used as a shield to hide and conceal activities between the Atteberrys and their consulting firm, Vermilion, and Brunner and EB5 Capital. The activities between the Atteberrys, Vermilion, Brunner and EB5 Capital involved direct

---

[2] The Rock Island Police Department turned the seized materials over to the FBI. The materials were not returned until July, 2017.

communications with CMB contacts, CMB targeted projects, and use of CMB confidential and trade secret information.

49.     The same night the Rock Island Police Department executed the search warrant and seized the Atteberrys' computers, Kim Atteberry contacted Brunner for assistance in making contact with individuals in the EB-5 industry that Kim Atteberry had worked with while at CMB to reschedule meetings about EB-5 work.  Brunner learned that the Atteberrys had stolen materials that CMB deemed confidential, proprietary and trade secret and that she could capitalize on her relationship with Kim Atteberry and Vermilion to utilize CMB's information in connection with her company, EB5 Capital. Moreover, the Atteberrys and Vermilion were separated from a substantial portion of the stolen CMB material, and they recognized they needed to implement an alternative plan to compete in the EB-5 industry.  They chose to engage Brunner and EB5 Capital.

50.     Thus, on March 4, 2013 or sometime thereafter, Brunner and EB5 Capital joined together with Kim Atteberry, Chris Atteberry and Vermilion in a conspiracy to damage CMB by subverting and steering away potential CMB-originated investment targets and utilizing CMB's trade secrets. The details of the conspiracy between Brunner were concealed by Brunner, EB5 Capital, the Atteberrys and Vermilion (the "Conspirators") by virtue of the execution of the March 4, 2013 NDA.

51.     After the execution of the NDA, the acts conducted by the Conspirators included: (i) attempting to intentionally steal CMB potential business with developers and directing developers to Angelique Brunner and EB5 Capital; (ii) utilizing confidential, proprietary and trade secret documents and know-how created by CMB so that the Conspirators could compete with CMB and obtain unfair advantage; and (iii) utilizing CMB's contacts to obtain documentation they knew

contained confidential and trade secret materials of CMB.  More specifically, the acts undertaken in furtherance of the conspiracy include:

      a.    Kim Atteberry falsely advised at least one CMB client, involved in the "Buckingham transaction", one of the investment targets in Tennessee, a $46 million loan, that CMB was no longer interested in pursuing its project with the intent to direct the project to her own consulting company and to Brunner and EB5 Capital. Kim Atteberry manipulated a communication to the developer of the Buckingham project that CMB was no longer interested in the developer's project. Kim Atteberry furthered the conspiracy by emailing a financial package that she unlawfully had in her possession to Brunner. Brunner knew Kim Atteberry was no longer employed by CMB when the financial package was transmitted to her.  In addition, Kim Atteberry furthered the conspiracy by using email to arrange for a telephonic conference with a potential EB-5 project finance sourcing company, Waveland Financial, an entity with a principal place of business in Cook County, Illinois and which was seeking financing for its client Buckingham Companies.

      b.    Kim Atteberry sought to and did arrange communications between herself, Brunner and several of CMB's customers, including Waveland Financial and Buckingham Companies.  Kim Atteberry facilitated such communications by arranging or trying to arrange direct communication between these customers and Brunner/EB5Capital or acting as the intermediary between the customers and Brunner/EB5 Capital.  The Conspirators participated in activities to compete with CMB by using CMB's proprietary material against CMB's interest and for their benefit while endeavoring to divert CMB business opportunities, including the Buckingham Nashville, Tennessee project by misrepresenting CMB's interest in the projects to potential developers.

### Brunner and EB5 Capital's Intentional and Active Participation in the Conspiracy

52.     CMB's confidential and proprietary information is not available to the general public or to CMB's competitors through legitimate means. CMB does not provide its confidential or proprietary information to potential investors or potential developers without requiring that the interested parties sign a non-disclosure agreement and/or without removing confidential information from the released material.

53.     Equally as sensitive as its own information, CMB retains and protects confidential and proprietary business information on behalf of various state, federal and private business entities seeking EB-5 investment from CMB and partnerships and clients.  The nature of these projects, their scope, and their business plans are highly sensitive, and CMB is required to sign nondisclosure agreements ("NDAs") with these entities as a precondition for even initial discussions about potential business.  Violation of the terms of these NDAs can subject CMB to significant financial penalties, as well as the loss of millions of dollars in investment opportunities for CMB and its clients.

54.     Because the stolen CMB confidential information maintained by CMB is essential to the operation of CMB's successful business, the Conspirators were afforded the opportunity to instantly establish a competing business enterprise with CMB and approach CMB's existing customers, potential customers, and potential project managers for work.

55.     Indeed, on March 4, 2013, the Atteberrys and Vermilion began conspiring and working with Brunner to create economic impact reports to obtain EB-5 projects utilizing CMB's proprietary and confidential information.  The Atteberrys, through Vermilion, sent multiple invoices to Brunner for such work in the first three months after Kim Atteberry's resignation from CMB.

56.     In furtherance of the civil conspiracy with Brunner and EB5 Capital, Kim Atteberry used CMB trade secret information to engage in contact with CMB clients, potential clients, and investment projects known to them by virtue of CMB's operations.

57.     Additionally, by virtue of her former role in CMB, Kim Atteberry has extensive knowledge of CMB's business, including knowledge of confidential personnel information, CMB products, services, project certification, and client validation procedures.  Through her participation in CMB's usual business, she took part in marketing, selling, and serving CMB investors, developers, and perspective customers, all using CMB's financial, managerial, and information resources, including CMB's confidential information.

58.     Brunner, by virtue of her former role as an Independent Contractor for CMB, and by her acknowledgment of same when she executed an Independent Contractor Agreement with CMB, had knowledge that CMB maintained its business materials as confidential and proprietary and had systems and protections in place to secure same.  Moreover, Brunner learned that the Atteberrys' home was raided by the authorities based on CMB's assertion that the Atteberrys stole CMB's confidential and trade secret materials.

59.     The Conspirators expended substantial time and resources to obtain CMB documents from a source in China so that they could copy CMB's confidential, proprietary and trade secret process contained within its jobs report. The Conspirators selected Brunner to secure a copy of a confidential CMB jobs report and other documents which Kim Atteberry had written for CMB from sources in China.  The intended purpose of the search was so that Kim Atteberry could use the template, methodologies, formulas and carefully crafted language and information in the CMB jobs report for an EB5 Capital project. The Conspirators explicitly communicated they intended to find CMB materials so that they did not have to "reinvent the boilerplate" or "reinvent the wheel".

Moreover, Kim Atteberry specifically requested jobs reports that were written after a certain time period because the content of the jobs reports had changed and Kim Atteberry wanted the more current reports for her "boilerplate".

60.     In furtherance of the conspiracy to violate the Illinois Trade Secret Act, Brunner secured the requested jobs report in China and transmitted the jobs report to Kim Atteberry, while Kim Atteberry was still a resident of Illinois, so that she could use it and did use it as a template and incorporate the format and the methodologies into a project for EB5 Capital. With regards to CMB's job report that Brunner acquired in China through illicit means, it took Brunner over two months to locate this report. When Brunner ultimately acquired it, she immediately sent the report to Kim Atteberry stating she had found the report. Kim Atteberry and Brunner knew CMB's report was confidential and proprietary information—indeed, the report had "Confidential" stamped on each page. Kim Atteberry, Brunner and EB5 Capital willfully used this report and other CMB information to allow Kim Atteberry, through Vermilion, to produce reports to enhance the business of EB5 Capital and improperly compete with CMB in the EB-5 marketplace.  Without CMB's information, Kim Atteberry would have been incapable of creating such reports for Brunner and EB5 Capital.

61.     In addition, in furtherance of the conspiracy, Kim Atteberry used "from her head" various confidential and proprietary information and methodologies which she had learned during her tenure at CMB in various projects for Brunner and her firm EB5 Capital.

62.     The Atteberrys' and Brunner's use of CMB's proprietary and confidential information has allowed Brunner to enhance EB5 Capital's profile in the EB-5 industry and EB5 Capital has since acquired more EB-5 projects and investors.  Absent use of CMB's information, EB5 Capital would not have been able to do so.

63.     The Conspirators continued to work together on EB-5 projects.

## COUNT I
## CIVIL CONSPIRACY TO VIOLATE THE ILLINOIS TRADE SECRET ACT
### (Against Angelique Brunner and Pettles Group, LLC d/b/a EB5 Capital)

64.     Plaintiffs re-allege and incorporate herein by reference each and every allegation contained in Paragraphs 1- 63 of the Complaint.

65.     Defendants intentionally committed acts in furtherance of their conspiracy to solicit CMB customers, interfere with CMB contracts, and to acquire and to use, without authorization, CMB's confidential information and trade secrets in violation of 765 Ill. Comp. Stat. 1065/1, *et seq.*

66.     Specifically, Defendants conspired together with Kim Atteberry, Chris Atteberry and Vermilion to knowingly misappropriate and to use in their own competing business projects CMB's jobs reports, economic analyses templates, and other confidential documents, for the purpose of diverting CMB business to themselves and  to compete unfairly with CMB by using CMB's trade secret information in violation of the Company's non-disclosure agreements.

67.     CMB takes affirmative efforts to maintain the secrecy of the information and documents that Defendants improperly acquired and misappropriated by using password protection, limited distribution, non-disclosure agreements, and notification to employees that the information is confidential and not to be disseminated outside the Company without proper authorization. In addition to all other steps taken to protect its confidential and proprietary information CMB requires all departing contractors and employees to return all such information upon request.

68.     Kim Atteberry, Chris Atteberry and Vermilion did not return such information upon CMB's request upon Kim Atteberry's departure. Subsequent to March 4, 2013, in furtherance of the civil conspiracy alleged here, Defendants utilized such CMB information with knowledge that it had been misappropriated for the benefit of themselves and to the competitive disadvantage of CMB.

69.     In furtherance of the conspiracy, Defendants, the Atteberrys and Vermilion intentionally sought out CMB confidential and proprietary materials in a foreign country. After

several months, Defendants, the Atteberrys and Vermilion tracked down a jobs report they had been searching for from some unknown source in China – a report that had the term "Confidential" stamped across the entire document. The purpose of tracking down the document was to use it as a template for EB5 Capital projects. The form and substance of the jobs report had been used by CMB and approved by the USCIS. Thus, the job report was valuable to Defendants in obtaining EB-5 work and approval from the USCIS.

70.     CMB derives economic value, or the potential for economic value, from the use of the information that Defendants, the Atteberrys and Vermilion improperly acquired and knowingly misappropriated through their conspiracy.

71.     As a result of Defendants' actions in furtherance of their conspiracy and improperly taking and using CMB trade secrets and proprietary information, CMB has suffered lost business and faces irreparable harm in the form of lost customers, lost position in the marketplace and loss of the economic value of its trade secret information which it developed over a period of twenty years of experience in the EB-5 business. As a result of the conspiratorial actions set forth herein, Defendants have been unjustly enriched as they were able to acquire and use CMB's trade secret information without cost to Defendants and were able to use said information and to unfairly compete with CMB in the EB-5 market place.

72.     CMB suffered harm in this district as a result of the unlawful acts.

**COUNT II**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**(Against Angelique Brunner and Pettles Group, LLC d/b/a EB5 Capital)**

73.     Plaintiffs re-allege and incorporate herein by reference each and every allegation contained in Paragraphs 1- 63 of the Complaint.

74.     Defendants utilized CMB's contacts and client lists and actively misled them with respect to CMB's interest in potential business deals as part of Defendants intentional scheme to

compete with CMB's business operation and to divert said business to themselves, the Atteberrys and Vermilion.

75.     CMB reasonably expected to enter into and continue a business relationship with those clients that Defendants, the Atteberrys and Vermilion conspired to be diverted from CMB.

76.     Defendants purposefully interfered with CMB's current and expected economic advantage in order to divert said projects so that Defendants could benefit themselves through their conspiracy with respect to the following projects and customers: Waveland Financial, Buckingham projects, Nashville Tennessee projects and others yet to be discovered.

77.     As a result of Defendants' intentional interference with CMB's economic advantage, CMB suffered damages, including delay damage, economic hardship and loss of business reputation.

WHEREFORE, Plaintiffs, CMB EXPORT, LLC and CMB SUMMIT, LLC d/b/a CMB REGIONAL CENTERS, respectfully request that this Honorable Court enter an Order against Defendants as follows:

a.     A permanent injunction prohibiting Defendants from using, disclosing or further misappropriating CMB's trade secrets and confidential information;

b.     Monetary damages to compensate CMB for unjust enrichment, lost opportunity and the harm it suffered as a direct and proximate result of Defendants' conspiracy to violate the law; and

c.     An order requiring Defendants to return all confidential and proprietary information that is the property of CMB, its clients, or its potential or actual business partners.

Dated:_____, 2018.

Respectfully submitted,

By: /s/ _____

Kenneth J. Joyce, Esq.
Florida Bar No. 986488
Stacy M. Schwartz, Esq.
Florida Bar No. 520411
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
*Counsel for Plaintiffs CMB Export, LLC and CMB*
*Summit, LLC d/b/a CMB Regional Centers*
110 Southeast Sixth Street, Suite 2600
Fort Lauderdale, Florida 33301
Telephone:   954.728.1280
Facsimile:   954.728.1282
E-Service:  ftlemaildesig@lewisbrisbois.com
E-Mail:  Ken.Joyce@lewisbrisbois.com
E-Mail:  Stacy.Schwartz@lewisbrisbois.com

John J. Michels, Jr., Esq.
ARDC No.: 6278877
Judith S. Sherwin, Esq.
ARDC No.: 2585529
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
*Counsel for Plaintiffs CMB Export, LLC and CMB*
*Summit, LLC d/b/a CMB Regional Centers*
550 West Adams Street, Suite 300
Chicago, Illinois 60661
Telephone:   312.345.1718
Facsimile:   312.345.1778
E-Service:  den.e-storage@lewisbrisbois.com
E-Mail:  John.Michels@lewisbrisbois.com
E-Mail:  Judith.Sherwin@lewisbrisbois.com